**No. 25-60703**

---

IN THE
# United States Court of Appeals
# For the Fifth Circuit

---

ROBBI J. JONES, KIPLING JONES & COMPANY, LTD.,
*Petitioners,*
v.
SECURITIES AND EXCHANGE COMMISSION,
*Respondent,*
FINANCIAL INDUSTRY REGULATORY AUTHORITY, INCORPORATED,
*Intervenor.*

---

On Petition for Review of Final Agency Action of the United States Securities & Exchange Commission
Admin. Proc. File No. 3-20209 (Nov. 28, 2025)

---

**CORRECTED PETITIONERS' OPENING BRIEF**

---

Dominic E. Draye
Matthew P. Hoxsie
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd., Suite 800
Phoenix, AZ 85016
(602) 445-8000
drayed@gtlaw.com
hoxsiem@gtlaw.com

Counsel for Petitioners

# CERTIFICATE OF INTERESTED PERSONS

Petitioners certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**1) Petitioners:**

Robbi J. Jones; Kipling Jones & Co., LTD

**2) Respondent:**

United States Securities and Exchange Commission

**3) Intervenor:**

Financial Industry Regulatory Authority, Inc.

**4) Counsel for Petitioners:**

Dominic E. Draye & Matthew P. Hoxsie; Greenberg Traurig, LLP

**5) Counsel for Respondent:**

Daniel Staroselsky & Kerry J. Dingle; U.S. Securities and Exchange Commission

**6) Counsel for Intervenor:**

Allyson N. Ho, Amir C. Tayrani, Alex Gesch, & Giuliana C. Cipollone; Gibson, Dunn & Crutcher LLP

Daniel Boyd Ranking & Aaron M. Streett; Baker Botts L.L.P.

*/s/ Matthew P. Hoxsie*
Matthew P. Hoxsie
Dominic E. Draye
Counsel for Petitioners

# STATEMENT REGARDING ORAL ARGUMENT

Petitioners Robbi J. Jones ("Ms. Jones") and Kipling Jones & Company, LTD ("KJC") (collectively, the "Petitioners"), request oral argument as they believe it could significantly aid the decisional process in this case, which involves several constitutional challenges.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................i

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS .......................................................................iv

TABLE OF AUTHORITIES..................................................................vi

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

INTRODUCTION..................................................................................3

STATEMENT OF THE CASE ..............................................................6

I. Petitioners ..........................................................................6

II. CD-0331...............................................................................7

III. City of Houston's Credit Card Investigation ..........................9

IV. 2014 Cycle Examination and Ensuing Investigation...........11

V. FINRA's Complaint.............................................................17

VI. Extended Hearing Panel Decision.......................................18

VII. NAC Decision .......................................................................20

VIII. The Commission Decision ....................................................21

STANDARD OF REVIEW....................................................................22

SUMMARY OF THE ARGUMENT ......................................................22

ARGUMENT .......................................................................................25

I. The Commission Violated the APA and the Constitution by Approving an Arbitrary and Capricious Decision and Punishment Imposed Without Due Process of Law ............25

A. FINRA Is a State Actor and Must Afford Constitutional Protections ..... 25

B. If FINRA Is Not a State Actor, its Delegation Is Unconstitutional ..... 35

C. The SEC's Final "Decision-Making" Does Not Rectify the Constitutional Problems ..... 39

D. The Record Demonstrates Multiple Ways in which FINRA Conducted Its Disciplinary Proceedings That Could Not Occur for a State Actor—Resulting in an Excessive and Punitive Lifetime Bar ..... 44

II. FINRA's Structure Violates the Appointments and Removal Clauses ..... 57

III. The Sanctions Imposed Against Petitioners Violate the Right to Trial by Jury ..... 64

CONCLUSION ..... 68

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alliance for Hippocratic Medicine v. F.D.A*,
No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) ................ 68

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ................ 37

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ................ 52

*Ass'n of Admin. Law Judges v. Colvin*,
777 F.3d 402 (7th Cir. 2015) ................ 30

*Axon Enterp., Inc. v. F.T.C.*,
598 U.S. 175 (2023) ................ 67

*Bandimere v. S.E.C.*,
844 F.3d 1168 (10th Cir. 2016) ................ 60, 61, 62

*Barnes v. Veath*,
No. 14-cv-NJR, 2014 WL 7005190 (S.D. Ill. Dec. 11, 2014) ................ 56

*Birkelbach v. S.E.C.*,
751 F.3d 472 (7th Cir. 2014) ................ 31

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ................ 30

*Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n*,
531 U.S. 288 (2001) ................ 27, 33, 34

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................ 60

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ................ 32

*Carr v. Saul*,
593 U.S. 83 (2021) .......... 67

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) .......... 36

*Civil Rights Cases*,
109 U.S. 3 (1883) .......... 25

*Dep't of Transp. v. Ass'n of Am. R.R. (American Railroads I)*,
721 F.3d 666 (D.C. Cir. 2013) .......... 35

*Dep't of Transp. v. Ass'n of Am. R.R. (American Railroads II)*,
575 U.S. 43 (2015) .......... 23, 35, 36

*Dexter v. Depository Tr. & Clearing Corp.*,
406 F. Supp. 2d 260 (S.D.N.Y. 2005) .......... 26

*El Paso Nat. Gas Co. v. Neztsosie*,
526 U.S. 473 (1999) .......... 46

*Env. Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) .......... 42

*F.C.C. v. Consumers' Research*,
606 U.S. 656 (2025) .......... 39, 40

*Fitzgerald v. Hampton*,
467 F.2d 755 (D.C. Cir. 1972) .......... 43, 44

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .......... 58, 59, 60

*Freytag v. C.I.R.*,
501 U.S. 868 (1991) .......... 57, 58, 60, 61

*Higazy v. Templeton*,
505 F.3d 161 (2d Cir. 2007) .......... 23

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .......... 58

*In re Murchison*,
349 U.S. 133 (1955) .......... 44

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) .......... 27, 28, 30, 31

*Jarkesy v. S.E.C.*,
34 F.4th 446 (5th Cir. 2022) .......... 22

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .......... 62

*Liteky v. United States*,
510 U.S. 540 (1994) .......... 53

*Lucia v. S.E.C.*,
138 S. Ct. 2044 (2018) .......... 59

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982) .......... 23

*Marsh v. Alabama*,
326 U.S. 501 (1946) .......... 27

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) .......... 27, 31

*N.C.A.A. v. Tarkanian*,
488 U.S. 179 (1988) .......... 33, 34

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) .......... 40

*PAZ Securities, Inc. v. S.E.C.*,
494 F.3d 1059 (D.C. Cir. 2007) .......... 65

*Saad v. S.E.C.*,
873 F.3d 297 (D.C. Cir. 2017) .......... 65

*Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*,
786 F.2d 1359 (9th Cir. 1986) .......... 61

*S.E.C. v. Jarkesy*,
603 U.S. 109 (2024) ........................................ 63, 64, 66

*Sims v. Rowland*,
414 F.3d 1148 (9th Cir. 2005) ........................................ 52

*Smith v. S.E.C.*,
171 F.4th 798 (6th Cir. 2026) ........................................ 38

*Sprauve v. West Indian Co. Ltd.*,
799 F.3d 226 (3d Cir. 2015) ........................................ 63

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ........................................ 39

*Terry v. Adams*,
345 U.S. 461 (1953) ........................................ 28, 29

*United States v. Avila*,
634 F.3d 958 (7th Cir. 2011) ........................................ 46

*United States v. Germaine*,
99 U.S. 508 (1878) ........................................ 60

*United States v. Harvey*,
2 F.3d 1318 (3d Cir. 1993) ........................................ 46

*United States v. Microsoft*,
253 F.3d 34 (D.C. Cir. 2001) ........................................ 53

*Witte v. United States*,
515 U.S. 389 (1995) ........................................ 54

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 ........................................ 58, 59

U.S. Const. amend. VII ........................................ 64

**Federal Statutes**

5 U.S.C. § 706(2) ........................................ 23

15 U.S.C. § 78o(a)(1) .......... 29

15 U.S.C. § 78s(b) .......... 31, 34

15 U.S.C. § 78s(c) .......... 31

15 U.S.C. § 78s(d)(2) .......... 28

15 U.S.C. § 78s(e)(2) .......... 24, 45

15 U.S.C. § 78s(h) .......... 31

15 U.S.C. § 78y(a)(4) .......... 22

**Other Authorities**

17 C.F.R. § 240.15b9-1 .......... 28

*Dep't of Enf't v. Craig Scott Hartman*,
No. 2016052604602 (OHO Nov. 11, 2018) .......... 46

*Dep't of Enf't v. Larson*,
No. 2014039174202, 2018 FINRA Discip. LEXIS 22 (OHO June 14, 2018) .......... 47

*Dep't of Enf't v. Rani T. Jarkus & William H. Carson*,
No. 2009017899801 (OHO Feb. 7, 2014) .......... 46

*Dep't of Enf't v. Richard Novack*,
No. 2009016159103 (OHO Aug. 12, 2013) .......... 47

FINRA by-law Art. V, § 5.3 .......... 61

FINRA by-law Art. V, § 5.8 .......... 61

FINRA Office of Hearing Officers' Decisions and Orders .......... 60

FINRA Rule 8320(a) .......... 66

FINRA Rule 9332 .......... 51

FINRA, *Sanction Guidelines* (2015) .......... 41, 44, 50, 55, 66

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, *in* Building Responsive and Responsible Financial Regulators in the Aftermath of the Global Financial Crisis 249 (Pablo Iglesias-Rodriguez ed. 2015) .......... 26, 32, 40, 42

*In the Matter of the Application of Behnam Halali for Review of Action Taken By FINRA,* Exchange Act Release No. 34-79722, 2017 WL 24498 (Jan. 3, 2017) .......... 42

*In the Matter of the Application of David Adam Elgart for Review of Action Taken By FINRA,* SEC Release No. 81779, 2017 WL 4335050 (Sept. 29, 2017) .......... 49

*In the Matter of the Application of John Edward Mullins and Kathleen Maria Mullins for Review of Disciplinary Action Taken By FINRA,* SEC Release No. 66373, 2012 WL 423413 (Feb. 10, 2012) .......... 61

*In the Matter of the Application of Merrimac Corporate Securities, Inc. and Robert G. Nash for Review of Disciplinary Action Taken By FINRA,* Exchange Act Release No. 86404, 2019 WL 3216542 (July 17, 2019) .......... 48, 49

*In the Matter of the Application of North Woodward Financial Corporation and Douglas A. Troszak for Review of Disciplinary Action Taken By FINRA,* Exchange Act Release No. 74913, 2015 WL 2151765 (May 8, 2015) .......... 50

*In the Matter of the Applications of Trevor Michael Saliba and Arthur Mansourian for Review of Disciplinary Action Taken By FINRA,* SEC Release No. 91527, 2021 WL 1336324 (Apr. 9, 2021) .......... 48

Internal Service Memorandum No. 201623006 (June 3, 2016) .......... 35

Michael Deshmukh, *Is FINRA a State Actor*, 67 Vand. L. Rev. 1173 (2014) .......... 29

Richard L. Stone and Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, No. 2:453 Columbia Bus. L. Rev. 453 (1995) .......... 32

Roberta S. Karmel*, Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies*, 14 Stan. J.L. Bus. & Fin. 151 (2008) .......... 29

*S. Comm. on Banking, Housing & Urban Affairs, Securities Acts Amendments of 1975*, S. Rep. No. 94-75 (1975) .......... 26

William A. Birdthistle and M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1 (2013) .......... 32

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 15 U.S.C. § 78y(a). The United Sates Securities and Exchange Commission ("SEC" or the "Commission") entered its final order in File Number 3-20209 on November 28, 2025, SEC Release No. 104273. Petitioners timely filed their Petition for Review on December 22, 2025, within the 60 days required by 15 U.S.C. § 78y(a)(1).

## ISSUES PRESENTED FOR REVIEW

1. Whether the SEC's order—affirming the Financial Industry Regulatory Authority's ("FINRA's") imposition of sanctions against Petitioners—violated the Fifth Amendment and the Administrative Procedure Act ("APA").
2. Whether the SEC's order—affirming FINRA's imposition of sanctions—deprived Petitioners their right to a jury trial in violation of the Seventh Amendment?
3. Whether the SEC's order—affirming FINRA's imposition of sanctions—must be vacated because FINRA's imposition of sanctions was imposed by officers in violation of the Appointments and Removal Clauses.

## INTRODUCTION

The SEC requires virtually every broker-dealer in the country to submit to FINRA's oversight and discipline. That arrangement creates a variety of constitutional problems. This case illustrates the harm to regulated parties from a state actor that does not afford constitutional due process, ignores statutory limitations on sanctions, and conducts its regulatory mission without the accountability enshrined in the Appointments Clause. As a result of these failures, FINRA used conduct as both a violation and an aggravating factor, increased consecutive two-year suspensions against Petitioners to a lifetime bar (despite not cross-appealing, and with a competitor sitting on the panel), and imposed purely punitive punishments against Petitioners untethered from like cases and despite an absence of any actions that impeded FINRA's investigation. A two-year suspension should have been the maximum result imposed in this case. Instead, FINRA imposed and the SEC affirmed a lifetime ban, destroying Petitioners' reputation and ability to earn a living.

Without the benefit of due process and subject to a regulatory body that acts as legislator, prosecutor, and adjudicator all-in-one, Petitioners

were denied the ability to defend themselves as they would have before an agency subject to constitutional protections. And they were deprived a right to a jury trial despite FINRA imposing sanctions totaling $38,000 and the equivalent of professional decapitation. That the SEC then adopted FINRA's sanctions whole-cloth only reinforces the Constitutional infirmities—the SEC's review does not obviate them.

Petitioners' treatment by FINRA, a so-called "self-regulatory organization" ("SRO"), is an affront to due process. The Securities Exchange Act of 1934 ("Exchange Act") charges the SEC with responsibility to regulate broker-dealers, a duty that it discharges through the SROs it oversees. So close is the relationship between the Commission and SROs that the SEC can reject or alter rules that an SRO adopts or even initiate rulemaking of its own to change existing SRO rules. But describing SROs in the plural is misleading; with the SEC's blessing the last two principal SROs merged to form FINRA in 2007. That fact, combined with the SEC's requirement that every broker-dealer must be a member of an SRO, means that FINRA regulates the entire securities industry (acting as legislator in promulgating rules, prosecutor

in enforcing both FINRA and SEC rules, and adjudicator), save the few broker-dealers who have seats on a national exchange.

Courts have developed the state-actor doctrine to protect citizens in precisely these circumstances. This Court should take this occasion to confirm that, despite FINRA's formal independence and its objections here, the organization functions as an agent of the government when adjudicating member misconduct and imposing sanctions like expulsion from the public markets.

That is ever more important where FINRA operates without need to provide due process and where the SEC maintains a never-ending right to extend its time to make a decision on appeal. Petitioners submitted their reply brief to the SEC on June 15, 2021. From that point, the SEC granted itself continuous orders to extend the time to issue a decision ***until November 28, 2025*** (while having previously denied Petitioners' request for a stay of the sanctions pending appeal). The saying "justice delayed is justice denied" is more than apropos. And even after taking more than four years to issue its decision, the SEC merely confirmed its prior position that FINRA is not a state actor, while

affirming FINRA's sanctions in all respects. There is no justification for the SEC's delays or its ratification of FINRA's actions in this case.

## STATEMENT OF THE CASE

### I. Petitioners

KJC was a small, minority-woman-owned firm founded by Ms. Robbi Jones in 2008. The firm was both a registered broker-dealer and a registered municipal advisor. Its business was primarily focused on providing municipal finance advice to public sector entities, especially in socioeconomically distressed communities not serviced by larger firms. KJC had no retail business, did no proprietary trading, had no customer accounts, and did not maintain custody or control of any customer funds.

Prior to this investigation, Ms. Jones had an unblemished 20-plus year career in the securities industry, served on professional boards, participated in licensing examinations, and served on various City of Houston blue ribbon committees.

Beginning in late 2013, Ms. Jones endured a multitude of personal tribulations that affected her ability to function at the highest level. *See generally* APP-79–90. In 2015, her ex-husband died after a two-year battle with colon cancer. Although divorced at the time of his death, Ms.

Jones maintained a close friendship with her ex-husband, who was the father of her only child, and frequently visited him in the hospital. During the same time, Ms. Jones' mother, in her 80s, was suffering from a variety of ailments endemic to a person of her age; Ms. Jones' daughter's boyfriend committed suicide; another relative to whom Ms. Jones was close passed away; Ms. Jones' brother became ill; and Ms. Jones herself was diagnosed with severe hypertension.

The weight and stress of these demands resulted in a few unintended mistakes and lapses in judgment. As a result, she provided insufficient or delayed responses to the FINRA staff conducting a Cycle Examination of KJC, which uncovered that Ms. Jones was unintentionally filing incorrect Financial and Operational Combined Uniform Single ("FOCUS") reports. She does not deny the inaccurate reports.

## II. CD-0331

KJC was required to maintain a minimum net capital of $100,000. In 2011, Ms. Jones increased the net capital to be reported in KJC's fourth-quarter FOCUS report. To do so, she obtained a roughly $70,000 one-year certificate of deposit from CNB Bank ("CD-0331") to list in

KJC's net capital computation. To pay for the CD, Ms. Jones took a one-year loan from CNB ("Loan-0331"). Because Ms. Jones was required to have an ownership interest in the CD, the CD was titled in both Ms. Jones' and KJC's name. But Ms. Jones did not believe the CD was encumbered. APP-357. By its terms, CD-0331 was to renew automatically on each maturity date, December 30. *Id.*

In early 2014, CNB contacted Ms. Jones regarding renewal of the CD and Loan. APP-246. Ms. Jones provided what she believed were the relevant records to renew the Loan, though she did not provide proof of income CNB requested as her ex-husband began suffering from cancer. APP-78–79. CNB separately sent Ms. Jones a letter advising Ms. Jones that the funds from the CD would be used to pay off the Loan. APP-244. But Ms. Jones did not receive, or recall receiving, the Loan payoff letter. APP-77–78. On March 5, 2014, CNB used CD-0331 to pay off the $70,313 loan balance. CNB did not make Ms. Jones aware that the CD had been closed. APP-78. As a result, Ms. Jones believed CD-0331 was still in effect, and KJC continued to list CD-0331 as an asset in its books and records and thus its subsequent FOCUS reports. Ms. Jones eventually received a new two-year CD in December 2014.

## III. City of Houston's Credit Card Investigation

In May 2013, Houston's Office of the Controller investigated Ms. Jones for her purported use of a city credit card to pay for five airline tickets in her name. Houston asked Ms. Jones for records of all flights, which Ms. Jones provided. APP-73, APP-74–75, APP-350. Ms. Jones was immediately able to disprove three of the alleged purchases. APP-345–347. For example, Ms. Jones informed Houston that a Memphis flight was purchased using points/miles. APP-350. Of the remaining two flights – one to Birmingham and the other to Chicago – Ms. Jones never had a City of Houston credit card but paid for the tickets herself, using her mother's credit card. APP-273, APP-276–277, APP-331, APP-351.

Ms. Jones' practice was to pay her expenses before submitting reimbursement requests to the City for its approval. APP-285, APP-330–331. Ms. Jones never sought reimbursement for non-City flights or expenses. APP-337. During Houston's investigation, Ms. Jones pulled up her Southwest account to show the City that she personally purchased the flights in question. While Houston requested documents from Southwest, Houston never subpoenaed Southwest for records. APP-335. Instead, Houston focused on the fact the last four digits of the credit card

used to purchase the tickets matched the last four digits of the City card. APP-336, APP-345. As improbable as it is, the same four digits were the last four digits of her mother's credit card, just as Ms. Jones had explained.

Ms. Jones asked Houston for documents and information supporting its allegations—which the City failed to provide. APP-332, APP-335. Because the allegations against her were based on documented trips one or two days removed from the trips she actually took, Ms. Jones believed that her identity was stolen. APP-287–312, APP-338, APP-344–345.

Ms. Jones asked for assistance from her brother, an attorney, and hired a criminal defense attorney to represent her before the City. While Houston ultimately sent her attorney a letter stating they had sustained allegations that she was responsible for the use of the City's credit card, APP-223, her attorney informed her that Houston would not pursue any charges and had closed its investigation. APP-123. The City of Houston continued to work with Ms. Jones and KJC during its investigation and thereafter. *Id.*

## IV. 2014 Cycle Examination and Ensuing Investigation

In November 2014, FINRA began its scheduled 2014 cycle examination of KJC. APP-95. FINRA asked Ms. Jones for various financial records including a general ledger for the month of September 2014, a trial balance and balance sheet as of September 30, 2014, and proof of all allowable assets claimed in KJC's net capital computation. Ms. Jones provided the general ledger, balance sheet, and trial balance on November 25, 2014. APP-255–270. The ledger, balance sheet, and trial balance identified CD-0331 with a balance of $70,313.09.

On December 4, 2014, FINRA requested a copy of KJC's general ledger covering the period January 2012 through October 2014, APP-99, which Ms. Jones provided the following week. On December 11, 2014, FINRA emailed Ms. Jones requesting more documents and proof of the $70,313.09 balance for the CD. APP-101, APP-388–395. Ms. Jones emailed FINRA on December 18, 2014 with additional documents and represented that CNB was unable to provide a statement of the balance, but in lieu of a balance sheet, Ms. Jones sent FINRA a screenshot showing the balance of the CD from December 30, 2011 through December 30, 2013. APP-107–120.

On January 16, 2015, Ms. Jones informed FINRA she had returned from Alabama where she was caring for her ill mother. APP-132. Ms. Jones told FINRA the CD had rolled over and that she had requested a new two-year maturity from CNB, requiring the creation of CD-0577, via a check with accumulated interest, which Ms. Jones had not yet received from CNB. FINRA requested documents pursuant to Rule 8210, but Ms. Jones was unable to provide the requested documents. On February 24, 2015, Ms. Jones provided FINRA with a copy of the new December 2014 CD. APP-150–152. She further informed FINRA that she requested additional records relating to CD-0331 from CNB. APP-154–155. Indeed, Ms. Jones contacted CNB multiple times, APP-157–161, and forwarded information to FINRA when she received it. APP-163–174.

In March 2015, FINRA issued a "Notice of Current Net Capital Deficiency." APP-185–187. The notice was based in part on KJC's failure to provide sufficient documentation to verify CD-0331, "bringing into question the balance of this allowable asset."

During the same 2014 cycle examination, FINRA discovered $2,500 paid to the criminal defense attorney Ms. Jones hired during the City of Houston investigation. APP-105. Ms. Jones met with FINRA on

December 12, 2014 and informed FINRA of the City of Houston credit card investigation. On December 23, 2014, Ms. Jones forwarded a letter drafted by the criminal defense attorney that stated "the City of Houston did not suffer any financial loss and Ms. Jones was cleared of any wrongdoing," and further that "none of the current contracts between Kipling, Jones and Company were affected and the firm continues to do business with the City of Houston." APP-123.

On February 5, 2015, FINRA sent Ms. Jones a Rule 8210 letter requesting a written statement regarding the City of Houston investigation. APP-135–138. Ms. Jones acknowledged delays while caring for her sick mother. Nevertheless, Ms. Jones provided written statements in mid-February corroborating what she had told the City, though the written statements focused on the flights *that she actually took* (and for which she was thus able to quickly disprove)—and not the Birmingham and Chicago flights which Ms. Jones did not take. APP-142–148, APP-285. To the extent her first statements were deficient, Ms. Jones emailed FINRA additional documents just one month later showing the Birmingham and Chicago flights were purchased from her mother's account – as she had demonstrated to Houston. APP-179–183.

Ms. Jones told FINRA that she had difficulties finding the documents because of a death in her family. When asked if it was her mother who had recently passed away, she wrongly said it was. *See* APP-488.

In early April 2015, Ms. Jones experienced blood pressure complications and was admitted to the hospital. APP-189. Despite substantially complying with numerous requests and submitting hundreds, if not thousands of pages of documents and records, Ms. Jones acknowledged her health and hospitalization delayed some responses to FINRA but that she also could have done better. APP-191.

Ms. Jones' on the record ("OTR") examination was scheduled for May 8, 2015. Before the examination, Ms. Jones and FINRA *agreed that no personal questions would be asked*. APP-195. Regarding CD-0331, Ms. Jones informed FINRA at the conclusion of the OTR that she had recently learned the CD was closed and therefore did not exist at the end of 2014, APP-199 (FINRA's acknowledgement of Ms. Jones' after-the-OTR representation), but that she had created a two-year CD at the end of 2014. APP-359–361. As to the City of Houston investigation, Ms. Jones testified during her OTR that the Southwest tickets were bought on a personal card, not the city's credit card. She also testified that she

had later learned that the secretary overseeing the City's cards (Ms. Chavez) had her responsibilities removed, leading Ms. Jones to believe something nefarious by the City secretary had occurred—comporting with her initial suspicion that her identity might have been stolen. APP-287, APP-336–339.

Indeed, nearly half of the OTR was spent discussing the City of Houston's investigation, during which Ms. Jones answered nearly every question that was asked of her. *See generally* APP-328–354.

As to her mother's health, however, Ms. Jones refused to answer personal questions. *E.g.*, APP-364. To the extent FINRA explained that they were trying to determine whether her mother could request or obtain records from Southwest Airlines, Ms. Jones directly answered that those requests had already been made. APP-361–363. ("My mother has looked. I've heard my mother cry because she couldn't help me. We've looked."))] In short, Ms. Jones provided both Houston and FINRA with all documents and records she had or could obtain. Nevertheless, Ms. Jones' refusal to answer personal questions was held against her and used as the basis for a separate violation.

On June 15, 2015, FINRA issued an additional Rule 8210 request, asking for "yes" and "no" answers regarding CD-0331. APP-198–201. For example, FINRA asked whether the CD was effective as of September 30, 2014. Ms. Jones provided a detailed narrative representing that she did not recall giving CNB authority to use the CD as collateral for the loan but understood it would negatively impact the net capital requirements. She further stated that she did not learn until March 2015 that CNB had liquidated the CD to pay off the loan. APP-203–206. Accordingly, Ms. Jones provided not only the answer FINRA sought – "that the CD was not in place on September 30, 2014" – but additional context *why* the submission of the inaccurate FOCUS reports was not knowing or willful. To that point, CNB's president admitted "that he could not verify that the bank had notified Ms. Jones that the CD would be used to satisfy her outstanding loan" and "acknowledged that he first told her about it in March 2015." APP-205. (FINRA nevertheless held against Ms. Jones the fact she did not answer simply "yes" or "no.")

In August 2015, Ms. Jones called FINRA and apologized for previously stating her mother had died. Ms. Jones stated she was under pressure with her ex-husband's cancer, her mother being ill, and her own

health, and that she didn't expect this personal detail to be a violation of FINRA rules. APP-369–376. In September, FINRA contacted CNB requesting additional records. Roughly one month later, CNB confirmed Ms. Jones' representations that CNB closed out CD-0331 in March 2014. APP-225–253.

## V. FINRA's Complaint

On April 24, 2017, FINRA Enforcement filed a complaint against Ms. Jones and KJC. APP-2–35. The first cause alleged that Ms. Jones caused KJC to willfully violate Section 17(a) of the Exchange Act and Exchange Act Rules 17a-3 and 17a-5, and that Ms. Jones and KJC had violated FINRA Rules 4511 and 2010. Specifically, the first cause charged that Ms. Jones caused KJC's books and records to be inaccurate because Ms. Jones did not record the cancellation of CD-0331, but instead allowed it to be shown as an asset through December 30, 2014. Enforcement also alleged that Ms. Jones filed, or caused to be filed, materially inaccurate FOCUS reports that inflated KJC's reported net capital by treating CD-0331 as an allowable asset, despite CD-0331 having been pledged as collateral for the loan and had then been cancelled.

The second cause alleged that Ms. Jones violated FINRA Rule 2010 because she provided false and misleading information to FINRA about CD-0331, the City investigation, and her mother's death.

The third and fourth causes alleged that Ms. Jones violated FINRA Rules 8210 and 2010 because she provided false and misleading information about CD-0331, the City of Houston investigation, and her mother's death to FINRA staff in response to FINRA Rule 8210 requests and refused to answer questions at her OTR regarding her mother. Ms. Jones denied the allegations and a five-day hearing was held.

## VI. Extended Hearing Panel Decision

On October 17, 2018, the Extended Hearing Panel issued its decision finding KJC liable under the first cause and Ms. Jones liable under all causes. APP-416–458. The Extended Hearing Panel did not, however, find many of the allegations proven. Under cause three, for example, Enforcement alleged that Ms. Jones made ten specific misstatements. The Extended Hearing Panel found only two.

Under cause one, the Extended Hearing Panel found that Ms. Jones caused KJC to fail to record the cancellation of CD-0331 as an allowable asset. The Extended Hearing Panel determined that KJC willfully

violated Section 17(a) of the Exchange Act, Exchange Act Rules 17a-3 and 17a-5, and FINRA Rules 4511 and 2010, and that Ms. Jones violated FINRA Rules 4511 and 2010. Under cause two, the Extended Hearing Panel found that Ms. Jones violated FINRA Rule 2010 by failing to inform FINRA staff that she had pledged CD-0331 as collateral for a personal loan and by misrepresenting to FINRA staff that her mother had died. Under cause three, the Extended Hearing Panel found that Ms. Jones violated FINRA Rules 8210 and 2010 by omitting the Birmingham and Chicago airline tickets from her February 2015 statements describing the Houston investigation and by falsely testifying at her OTR that CD-0331 was never pledged as security. Under cause four, the Extended Hearing Panel found that Ms. Jones violated FINRA Rules 8210 and 2010 because she refused to respond to questions at her OTR concerning her representations to FINRA staff about her mother.

For the first cause, the Extended Hearing Panel fined KJC $38,000, suspended Ms. Jones from associating with any FINRA member firm in any capacity for two years, barred her from associating with any FINRA member firm in any supervisory or principal capacity, and fined her $35,000. Because the Extended Hearing Panel determined that KJC's

violation was willful, the Extended Hearing Panel found that KJC was subject to statutory disqualification. For the second, third, and fourth causes of action, the Extended Hearing Panel imposed a unitary sanction and suspended Ms. Jones from associating with any FINRA member firm in any capacity for two years and fined her $35,000. The Extended Hearing Panel ordered that Ms. Jones' suspension under cause one run consecutively with the suspension imposed under causes two, three, and four. Petitioners appealed the Extended Hearing Panel's decision to the NAC. FINRA did not cross-appeal.

## VII. NAC Decision

On December 17, 2020, the NAC issued its decision affirming the Extended Hearing Panel's findings under cause one that KJC willfully violated Section 17(a) of the Exchange Act, Exchange Act Rules 17a-3 and 17a-5, and FINRA Rules 4511 and 2010 by creating and maintaining inaccurate books and records and by filing inaccurate FOCUS reports. APP-482–499. The NAC affirmed the $38,000 fine against KJC and affirmed the finding that KJC was subject to statutory disqualification. *Id.* The NAC also affirmed the Extended Hearing Panel's findings that Ms. Jones violated FINRA Rules 4511 and 2010 by causing KJC to create

and maintain inaccurate books and records and by causing KJC to file inaccurate FOCUS reports. The NAC extended Ms. Jones' suspensions into a lifetime bar in all capacities.

Under causes two through four, the NAC affirmed the Extended Hearing Panel's findings that Ms. Jones violated FINRA Rules 8210 and 2010 by providing false and misleading information to FINRA and by refusing to respond to FINRA staff's questions during her OTR. For these violations, the NAC extended Ms. Jones' punishment by barring her in all capacities, effective immediately. Finally, the NAC affirmed the Extended Hearing Panel's order that she and KJC pay, jointly and severally, hearing costs of $13,914.58 and imposed appeal costs of $1,573.34. The NAC did not affirm the $35,000 fine against Ms. Jones.

Ms. Jones and KJC timely appealed to the SEC.

## VIII. The Commission Decision

On November 28, 2025, the Commission issued its decision. APP-628–656. Briefing before the Commission was complete on June 15, 2021, APP-606, but the Commission granted itself consecutive extensions to rule until finally issuing its decision on November 28, 2025. The

Commission affirmed the NAC's decision in its entirety and rejected all of Petitioners' constitutional claims.

On December 23, 2025, Petitioners timely filed their petition for review to this Court. ECF No. 1-1.

## STANDARD OF REVIEW

The Court will sustain the SEC's factual findings if supported by substantial evidence but will modify or set aside the SEC's final order if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 15 U.S.C. § 78y(a)(4). This Court reviews constitutional claims de novo. *Jarkesy v. S.E.C.*, 34 F.4th 446, 451 (5th Cir. 2022).

## SUMMARY OF THE ARGUMENT

Congress authorized the SEC to regulate broker-dealers through SROs. 15 U.S.C. § 78s. Through historical consolidation, including the SEC terminating its own SRO-style oversight, FINRA now oversees virtually the entire population of broker-dealers. And it does so with SEC involvement in its rulemaking, but no SEC role in appointing FINRA's leadership or officers and with only a surface-level review of much of FINRA's enforcement discretion. This arrangement qualifies FINRA as

a state actor under any of the "different factors or tests" that the Supreme Court has used "in different contexts." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982). The alternative would be to permit the government to duck its constitutional obligations simply by enlisting "private regulators." *Dep't of Transp. v. Ass'n of Am. R.R.* (*American Railroads II*), 575 U.S. 43 (2015).

Several due process violations infected the proceedings against Petitioners here. These included the expansion of concurrent two-year suspensions into a lifetime bar despite FINRA Enforcement not appealing the decision, the imposition of an excessive and disproportionate sanction, a competitor serving on the NAC Panel, and an adjudicatory panel appointed in violation of the Constitution.

The APA forbids such actions because they are arbitrary and capricious, an abuse of discretion, "contrary to constitutional right," and "without observance of procedure required by law." 5 U.S.C. § 706(2). In particular, no state actor can ignore a citizen's Fifth Amendment due process rights, as FINRA did to Appellants. *See Higazy v. Templeton*, 505 F.3d 161, 170 (2d Cir. 2007) (recognizing Fifth Amendment rights in "any proceeding, civil or criminal, administrative or judicial,

investigatory or adjudicatory."). And the SEC cannot affirm FINRA's judgment after the unfair, arbitrary, and capricious process that produced it. Nor can the SEC affirm (let alone FINRA impose) a sanction without granting Petitioners a jury trial as dictated by the Seventh Amendment.

Additionally, and independently of the due process failures, the SEC may not affirm sanctions that are "excessive or oppressive" or "not necessary" to achieve the goals of the Exchange Act. 15 U.S.C. § 78s(e)(2). For the same reasons above and below, the lifetime bar is an "excessive" and "oppressive" sanction that is "not necessary" to achieve the goals of the Exchange Act because it is clearly incomparable with sanctions in related cases and banning Petitioners does nothing to respond to a private injury (none of which FINRA or the SEC has ever even identified) or restore anyone to the status quo ante. The punishment here simply imposes a professional "death sentence" on a businesswoman for her first offense and despite overwhelming evidence that Petitioners pose no threat of committing future errors.

# ARGUMENT

## I. The Commission Violated the APA and the Constitution by Approving an Arbitrary and Capricious Decision and Punishment Imposed Without Due Process of Law

Courts do not sit idly by when governmental entities outsource their regulatory functions to "private" organizations that in turn shirk the constitutional responsibilities that would have attached to their government sponsors. As a growing consensus of scholars and practitioners have recognized, FINRA has become the poster organization for the state-actor doctrine. This Court should decide that question and vindicate Petitioners' rights to due process and constitutional adjudication.

### A. FINRA Is a State Actor and Must Afford Constitutional Protections

With the ratification of the Reconstruction Amendments, the Supreme Court began applying constitutional standards to both States and private parties acting on their behalf. *Civil Rights Cases*, 109 U.S. 3, 13, 36 (1883) (applying the Fourteenth Amendment to "States, their officers and agents, and also upon, at least, such individuals and corporations as exercise public functions and wield power and authority under the State"). The state-actor doctrine imposes on ostensibly private

parties the obligation to comply with constitutional norms, but it also confers governmental benefits like immunity from suit.

FINRA has reaped the benefits for years. For example, FINRA embraces its status as a state actor when faced with a lawsuit, *see Dexter v. Depository Tr. & Clearing Corp.*, 406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) (affording immunity to FINRA predecessor because of its "quasi-governmental authority"), or when refusing to share information with state regulators, *see* Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All, in* Building Responsive and Responsible Financial Regulators in the Aftermath of the Global Financial Crisis 249 (Pablo Iglesias-Rodriguez ed., 2015) (hereinafter *Not Self-Regulation After All*).

FINRA may well be entitled to these benefits as a state actor, but they come with attendant responsibilities. Lawmakers recognized this bargain when adopting the 1975 amendments to the Exchange Act: because SROs "exercise government power . . . by imposing a disciplinary sanction, broadly defined, on a member or person affiliated with a member . . . [they] must be required to conform their activities to fundamental standards of due process." *S. Comm. on Banking, Housing*

*& Urban Affairs, Securities Acts Amendments of 1975*, S. Rep. No. 94-75, at 24-25 (1975). FINRA cannot continue to have its cake and eat it too.

The Supreme Court has announced three principles to identify state action by ostensibly private entities. First, the private party must perform a "public function" of the sort traditionally performed by the government. *Marsh v. Alabama*, 326 U.S. 501, 506 (1946). Second, there must be "a sufficiently close nexus between the State and the challenged action" by the private organization "so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176 (1972)). Third, some cases suggest an additional inquiry into whether the government is "jointly participating" or "entwined" with the work of the private actor. *Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 296, 302 (2001). Each of these standards confirms that FINRA is a state actor.

**1. Traditional public function**. The government traditionally exercises—and does in the current context—exclusive authority to adjudicate and punish violations of rules that its agencies promulgate and modify. Traditional control of the function at issue is strong evidence

that the private party is a state actor. Thus, in *Terry v. Adams*, 345 U.S. 461, 469 (1953), the Supreme Court deemed a private political organization a state actor because it administered a straw poll that determined the outcome of the primary election and amounted to "a duplication of [state] election processes." Suspiciously, membership in the private organization was automatic for every white registered voter in the county. *Id.* at 463. Elsewhere, the Court has found a traditional government function lacking because "the supplying of utility service is not traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353.

Here, there can be no doubt concerning the government's exclusive control over securities enforcement because (1) federal law requires virtually every broker-dealer to become a member of FINRA, and (2) every FINRA adjudication is subject to non-discretionary appeal to the SEC. The SEC can also institute its own review sua sponte. 15 U.S.C. § 78s(d)(2). This level of overlap is the kind of duplication that the *Terry* Court found indicative of state action. And just like every white voter in *Terry* automatically belonged to the Jaybird Party, 345 U.S. at 463, membership in FINRA encompasses every non-exchange broker-dealer.

Membership in a self-regulatory organization has been mandatory since 1983, when the SEC required every broker-dealer to belong to an SRO. 15 U.S.C. § 78o(a)(1); 17 C.F.R. § 240.15b9-1. And FINRA has been the sole SRO since 2007. Just as the Jaybird straw poll duplicated the Texas Democratic primary election, *id.* at 469, FINRA's adjudicatory function duplicates the work normally performed by the government. Michael Deshmukh, *Is FINRA a State Actor*, 67 Vand. L. Rev. 1173, 1194 (2014) ("[T]he government's intentions with FINRA are highly analogous to the regulatory dynamics in *Terry v. Adams*.").

While SROs of bygone generations might have acted with a measure of independence, they occupied a different role. Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies*, 14 Stan. J.L. Bus. & Fin. 151, 152 (2008) (explaining the evolution from "private sector membership organizations" to "more powerful organizations . . . integrated into the scheme of federal statutory regulation [that] now operate subject to [SEC] oversight of all their activities."). The modern SRO serves the governmental function of adjudicating violations and providing first-level review. This is the same function that exists throughout the federal

government and in state securities commissions, where it is performed by government officials. *See Ass'n of Admin. Law Judges v. Colvin*, 777 F.3d 402, 409 (7th Cir. 2015) (describing "adjudication of cases" as among "the core functions of the governmental unit involved").

FINRA's enforcement, investigation, and adjudication of rules that the SEC approves (or makes) against individuals and entities whom the SEC requires to belong to FINRA are functions traditionally performed by state actors alone.

**2. Nexus**. In cases involving a "governmentally protected monopoly," courts look for "a sufficiently close nexus between the State and the challenged action of the regulated entity." *Jackson*, 419 U.S. at 351. Mere government regulation is not enough to create a state actor, *id.* at 350, but greater levels of involvement will suffice, for example when the government "has provided such significant encouragement, either overt or covert, that the [conduct] must in law be deemed to be that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

In *Jackson*, the Court highlighted that the disputed policy had "never been the subject of a hearing or other scrutiny by the Commission." 419 U.S. at 354. In fact, the governing body had "never

even considered the [policy]" and apparently did not have "the power to disapprove it." *Id.* at 355.

This case is the opposite. The Commission scrutinizes and approves (or modifies or rejects) every rule FINRA promulgates. 15 U.S.C. § 78s(b). The SEC also may initiate its own rulemaking to "abrogate, add to, and delete from . . . the rules of a self-regulatory organization." 15 U.S.C. § 78s(c). The SEC's ability to write, rewrite, or reject FINRA's rules mirrors *Jackson*: a governmentally created monopoly with the added dimension of close supervision and overlapping rulemaking authority. Moreover, the SEC can directly regulate and discipline FINRA, with penalties as drastic as revoking its registration. 15 U.S.C. § 78s(h).

And FINRA is not merely a private organization subject to government regulation. *Cf. Moose Lodge*, 407 U.S. at 176-77. Its entire reason for existence is duplicating a governmental function. FINRA enforces not only its own rules, but federal securities laws and SEC regulations as well. *E.g.*, *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 (7th Cir. 2014). It is therefore unlike a utility or railroad that primarily serves a non-governmental purpose. Moreover, scholars have noted that

whatever general autonomy FINRA or its predecessors might once have enjoyed is now vanishing. *See* William A. Birdthistle and M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1 (2013); Richard L. Stone and Michael A. Petrino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, No. 2:456 Columbia Bus. L. Rev. 453 (1995). Among other developments, FINRA has gained mandatory membership, and its board must now include a majority of non-industry members. The result is a universal regulator governed primarily by the SEC. As Commissioner Peirce noted, "on the strength of a government mandate and carrying out a regulatory mission using government-like tools, FINRA is difficult to distinguish from its patron agency." *Not Self-Regulation After All*, at 246.

On balance, the degree of involvement and "interdependence" makes the government a "joint participant" in FINRA's regulatory program. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Like the State of Delaware's role in leasing retail space in a government building to a restaurant in *Burton*, the SEC has handed FINRA a privileged place within the governmental edifice of securities regulation.

Assuming that arrangement is constitutional, it suffices to make FINRA a state actor.

**3. Entwinement**. Another path to state action is when a "nominally private entity" is "'entwined with governmental policies' or when government is 'entwined in [its] management or control.'" *Brentwood Acad.*, 531 U.S. at 296 (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)).

The ostensibly private organization in *Brentwood Academy* was responsible for organizing interscholastic sports among Tennessee high schools. The function at issue was "enforc[ing] a rule against a member school" when the organization "regulate[d] in lieu of the State Board of Education's exercise of its own authority." *Id.* at 290-91. In fact, the Board "went so far as to adopt a rule expressly delegating" its authority to the organization. *Id.* at 292 (quotation and modification omitted). The Court distinguished its earlier decision in *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179 (1988), which also involved an interscholastic athletic organization, because *Brentwood Academy* involved a single sovereign rather than a national coalition of States. 531

U.S. at 298. Ultimately, the degree of entwinement was sufficient to find a state actor despite the lack of a traditional public function. *Id.* at 303.

In the case of FINRA, entwinement mirrors *Brentwood Academy* in at least two dimensions. First, like the Tennessee Board of Education, the SEC has delegated rulemaking authority to the self-regulatory organization. As discussed above, the entwinement is even greater because of the formal process of revision and approval built into statute. *See* 15 U.S.C. § 78s(b)(1), (2). Second, like *Brentwood Academy* and unlike *Tarkanian*, FINRA is a creature of just one sovereign. FINRA has one customer: the SEC. It is immaterial that FINRA does not depend directly on the SEC for its budget because the state actor in *Brentwood Academy* also had a significant independent source of funding: gate receipts from sporting events. 531 U.S. at 299. Thus, FINRA's sizeable budget, which rivals that of the SEC and comes from *mandatory membership fees*, is not cause for finding independence but for recognizing its dependence on and entwinement with the SEC.

* * *

The relevant factors support treating FINRA as a state actor when engaged in enforcement and adjudication of rules, propounded pursuant

to a delegation from the SEC, and with the Commission's oversight and review. That insight is the premise for FINRA claiming state-actor benefits in other contexts and the IRS's conclusion that "FINRA is a corporation serving as an agency or instrumentality of the government of the United States." Internal Service Memorandum No. 201623006 (June 3, 2016).

### B. If FINRA Is Not a State Actor, its Delegation Is Unconstitutional

On the other hand, if FINRA is not a state actor, the implications for the Exchange Act's constitutionality are severe. Under that approach, the statutory scheme would effectuate a "pass-through" or "double" delegation to a private entity—*i.e.,* from Congress through the SEC to FINRA.

The Supreme Court and the District of Columbia Circuit confronted a similar structure in a pair of cases related to Amtrak's authority to issue standards in conjunction with the Federal Railroad Administration. *See Dep't of Transp. v. Ass'n of Am. R.R.* (*American Railroads I*), 721 F.3d 666 (D.C. Cir. 2013); *American Railroads II*, 575 U.S. 43 (2015).

The D.C. Circuit initially accepted Congress's statement that Amtrak "is not a department, agency, or instrumentality of the United

States' Government" and "shall be operated and managed as a for-profit corporation." *American Railroads I*, 721 F.3d at 675 (quoting 49 U.S.C. § 24301(a)(2), (3)). It concluded that Amtrak was a private entity and consequently that "it was impermissible for Congress to 'delegate regulatory authority to a private entity.'" *American Railroads II*, 575 U.S. at 51 (quoting *American Railroads I*, 721 F.3d at 670); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (prohibiting any such delegation of authority).

The Supreme Court reversed, but only by concluding that Amtrak was not actually a private organization. *American Railroads II*, 575 U.S. at 51, 54. Echoing concerns in the present case, the Court explained that "[t]o hold otherwise would allow the Government to 'evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Id.* at 54 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).

Instead, the Court reasoned that Amtrak exists "for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees, and that the Government exerts its control over Amtrak 'not as a creditor but as a

policymaker.'" *Id.* (quoting *Lebron*, 513 U.S. at 394, 398-99). Thus, "'for the purpose of individual rights guaranteed against the Government by the Constitution,'" Amtrak is an instrumentality of the federal government. *Id.* (quoting *Lebron*, 513 U.S. at 394, 398-99).

FINRA presents the same dilemma. Not only is permitting the sole modern SRO to create rules (a legislative function) and enforce those rules (an executive function) and adjudicate cases (a judicial function) contrary to state-actor precedent (as well as "part of the government itself" analysis), but it also runs headlong into a pass-through delegation. To avoid an unconstitutional interpretation of the Exchange Act, this Court should follow *American Railways II* and hold that FINRA is a state actor that operates under a permissible delegation from Congress but must therefore adhere to other principles in the Constitution.

Indeed, other courts have recently acknowledged the delegation problem arising from FINRA's structure. Judge Walker wrote, in a concurrence remanding an SEC order, that "because [FINRA] enforces federal law and rules that carry the force of law . . . without any initial approval from its supposed supervisor, the SEC[,] . . . [FINRA] transgresses the private nondelegation doctrine." *Alpine Sec. Corp. v.*

*FINRA*, 121 F.4th 1314, 1343-45 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in part and dissenting in part). The Sixth Circuit endorsed Judge Walker's concurrence, stating: "To be sure, Congress's decision to assign this enforcement authority to a private entity theoretically might raise private nondelegation problems, as Judge Walker has previously explained." *Smith v. S.E.C.*, 171 F.4th 798, 807 (6th Cir. 2026).

Judge Murphy's concurrence in *Smith* further clarifies the problem, noting that any reliance on pre-1983 cases suggesting FINRA is simply a private, voluntary, organization is no longer applicable because "[b]rokers do not have the same choice today. Far from it. Since 1983, Congress has barred Americans from engaging in the securities business unless they join a registered exchange or securities association." *Id.*, at *11 (Murphy, J., concurring). By *requiring* membership in the "private" organization, "Congress has thus put aspiring brokers to a choice: consent to forgo . . . constitutional protections or stay out of the brokerage business." *Id.* That FINRA then obtains the benefit of *immunity* belonging to the government only worsens the constitutional quagmire.

### C. The SEC's Final "Decision-Making" Does Not Rectify the Constitutional Problems

In its decision, the SEC sated that FINRA's delegation is permissible because FINRA merely "aids" the SEC in administering federal law and operates subordinate to the SEC, which "exercises 'authority and surveillance' over its activities." APP-508 (citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *F.C.C. v. Consumers' Rsch.*, 606 U.S. 656, 692-95 (2025)). The SEC's argument is mistaken. As a threshold matter, the SEC's reliance on *Sunshine Anthracite Coal Co.* ignores the minimal analysis given in that case to the private nondelegation issue, in which the Court's analysis involved four short sentences. *See* 310 U.S. at 399. And it ignores that the National Bituminous Coal Commission exercised "pervasive surveillance and authority" over the district boards of code members, subject to a Congressional statute that "specifie[d] in detail the methods of their organization and operation, the scope of their functions, and the jurisdiction of the Commission over them." *Id.* at 388. FINRA bears no relation to the coal boards at issue in *Sunshine Anthracite*.

Indeed, caselaw draws the following general line when considering private delegation challenges: private entities may serve as advisors that

propose regulations and may undertake ministerial functions, such as fee collection; but they may not be the principal decisionmaker in the use of federal power, may not create federal law, may not wield equal power to the agency, or regulate unilaterally. *See Oklahoma v. United States*, 163 F.4th 294, 306-307 (6th Cir. 2025) (collecting cases). FINRA carries out an executive function when determining to enforce its and the SEC's rules. And FINRA then exercises judicial authority reviewing its own use of its enforcement powers—all before so called "SEC review."

As Commissioner Peirce noted, "[i]n practice, . . . FINRA operates with substantial independence from the SEC. FINRA can set its own rulemaking and disciplinary agendas and budget without SEC input."[1] *Not Self-Regulation after all*, at 18-19. Further still, while "the SEC has the power to approve or disapprove FINRA rules, the SEC's Division of Trading and Markets typically exercises this authority through a delegation from the commission," and to "rescind the delegation, two commissioners must object in writing within five days of being notified of

[1] These facts also distinguish the *F.C.C. v. Consumers' Research* case upon which the SEC decision relies. APP-650. In that case, the Court relied on the fact that the FCC approved the Administrator's Board of Directors' budget. 606 U.S. 656, 693 (2025). Moreover, in that context, the Administrator merely made the initial projection of revenue and expenses, which involved only "arithmetic" and "no policy-making." *Id.* That is a far cry from FINRA's expansive reach and authority here.

staff plans": "[a]s a consequence, FINRA rules do not typically attract close attention from the SEC's commissioners." *Id.* at 19. And "[b]ecause many FINRA disciplinary actions are settled, the SEC reviews only a small subset of disciplinary actions." *Id.* That is, in many cases, FINRA exercises complete discretion to enforce and adjudicate without *any* SEC oversight. And FINRA members are required to cede to FINRA's authority or else risk FINRA's determination that even the failure to follow FINRA's orders should result in expulsion from the industry.

These concerns should not be surprising. FINRA wields vast investigative and enforcement powers, including the severe threat of lifetime bars. Through Rule 8210, FINRA wields the equivalent of the subpoena power and may demand production of records. Importantly, a failure to comply with a request under Rule 8210 can itself lead to disciplinary action up to and including an individual being barred for life from the financial industry. FINRA, *Sanction Guidelines* at 33, available at https://www.finra.org/sites/default/files/2015_Sanctions_Guidelines.pdf. Even "[w]here the individual provided a partial but incomplete response, a bar is standard unless the person can demonstrate that the information

provided substantially complied with all aspects of the request." *Id.* "Where mitigation exists, or the person did not respond in a timely manner, [FINRA should] consider suspending the individual in any or all capacities for up to two years." *Id.* Moreover, where FINRA can make a referral for criminal prosecution, the inability of a FINRA member to claim Fifth Amendment protections (if FINRA is not a state actor) may also shade a member's decision whether to respond to a Rule 8210 request, leading to a lifetime bar. *See, e.g.*, *In the Matter of the Application of Behnam Halali for Review of Action Taken By FINRA*, SEC Release No. 34-79722, 2017 WL 24498 (Jan. 3, 2017) ("[W]e have held repeatedly that Rule 8210's requirement that persons associated with FINRA member firms provide information in response to FINRA's requests does not impinge on the privilege against self-incrimination. Indeed, Enforcement informed Halali that the Fifth Amendment did not apply because FINRA was not a governmental agency and that asserting the Fifth Amendment could lead to a bar.").

FINRA also retains the ability to impose fines, which FINRA then uses to fund its expenses, creating a perverse incentive. *Not Self-Regulation after all*, at 22 n.103 ("FINRA . . . uses fines to cover capital

expenditures. This practice gives the regulator an incentive to impose fines and thus potentially clouds its disciplinary discretion.”).

And as demonstrated in this case, the SEC can grant itself unlimited extensions to rule, proving the saying “justice delayed is justice denied.” *Env. Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 311 (5th Cir. 2024). In this case, Petitioners completed briefing before the SEC ***on June 15, 2021.*** The SEC granted itself several extensions of time to issue its decision, ***until November 28, 2025***. When accounting for the FINRA NAC decision, dated December 17, 2020, nearly five years passed before the SEC’s opinion.

Stated simply, it is mere lip service to claim that FINRA “aids” the SEC, that the SEC remains the final decision-maker, and that FINRA operates as a mere “administrator.” Against this practical backdrop, it is no surprise that Commissioner Peirce believes that “FINRA is subject to less SEC oversight than the [PCAOB]” and that “if the Supreme Court applied the same reasoning it used in its consideration of the PCAOB’s constitutionality, it would find FINRA to be unconstitutional.”

### D. The Record Demonstrates Multiple Ways in which FINRA Conducted Its Disciplinary Proceedings That Could Not Occur for a State Actor—Resulting in an Excessive and Punitive Lifetime Bar

"The Fifth Amendment guarantees that no person shall be 'deprived of life, liberty, or property, without due process of law.'" *Fitzgerald v. Hampton*, 467 F.2d 755, 760 (D.C. Cir. 1972) (quoting U.S. Const. amend. V). "The Supreme Court has held that the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty and property' concepts of the Fifth Amendment, 'property' being the employment, and 'liberty' being the freedom to practice a chosen profession." *Id.* (applying due process in administrative proceedings) (citations omitted). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). This case includes several ways in which Ms. Jones enjoyed less process than she was due from a state actor.

***First***, FINRA (through the NAC) increased the sanctions initially ordered by the FINRA Hearing Panel, ultimately disproportionate to similar cases, despite FINRA Enforcement not cross-appealing the matter.

The Sanction Guidelines "recommend suspensions that do not exceed two years" as an "upper limit," barring extraordinary circumstances. FINRA, *Sanction Guidelines* (2015) at 11. Bars and expulsion are similarly extreme recourses which should be reserved for egregious cases. *Id.* at 33. Indeed, the recommendation for false or misleading FOCUS reports—one of the violations here—is between 30 days and at most "up to two years." *Id.* at 68 (for violations of FINRA Rule 2010 and SEC Rule 17a-5).

Here, FINRA Enforcement initially sought a lifetime bar but the Hearing Panel ordered instead two consecutive two-year suspensions. The NAC failed to properly explain why a lifetime bar was appropriate in this case, and indeed, based on the facts of the case, could not do so. The SEC, in its review, should have also recognized as much, as the Commission may not affirm sanctions that are "excessive or oppressive" or "not necessary" to achieve the goals of the Exchange Act. 15 U.S.C. § 78s(e)(2). Both the NAC and Commission erred. And the NAC did so despite FINRA not cross-appealing to increase the sanction.

With respect to the lack of cross-appeal, the United States' Supreme Court has repeatedly affirmed that, absent a cross-appeal, an appellee

"may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (quotation omitted). "The purpose of the cross-appeal rule is to give 'fair notice' to [a defendant] that the appellate court may increase his sentence." *United States v. Avila*, 634 F.3d 958, 961 (7th Cir. 2011). In *United States v. Harvey*, for example, the government conceded, and the court agreed, that the government's failure to file a cross-appeal precluded it from obtaining a sentence "more favorable" than that already imposed." 2 F.3d 1318, 1326, 1330 (3d Cir. 1993). FINRA and the SEC ignore those constitutional limits here.

As for the sanctions imposed, Petitioners' actions are far closer in kind to cases in which two to four-month suspensions have been imposed. *See Dep't of Enf't v. Craig Scott Hartman*, No. 2016052604602 (OHO Nov. 11, 2018) (respondent fined $5,000 and suspended four months for failing to provide documents and information requested pursuant to FINRA Rule 8210)[2]; *Dep't of Enf't v. Rani T. Jarkus & William H. Carson*, No.

---

[2] In *Craig Scott Hartman*, the respondent was otherwise barred for "failing twice to appear and give testimony" and "essentially refused to cooperate with FINRA in the conduct of its investigation."

2009017899801 (OHO Feb. 7, 2014) (respondent suspended two months, fined $5,000 for filing inaccurate FOCUS reports); *Dep't of Enf't v. Richard Novack*, No. 2009016159103 (OHO Aug. 12, 2013) (respondent suspended for one year and fined $25,000 for approving inaccurate FOCUS reports).

Petitioners' actions are less severe than even those in *Department of Enforcement v. Larson*, No. 2014039174202, 2018 FINRA Discip. LEXIS 22, at *172 (OHO June 14, 2018), where the Hearing Panel found that the respondent (a) submitted materially misleading Continuing Membership Applications (for which he was suspended for 18 months), (b) failed to provide complete and timely responses to FINRA's document and information requests (for which he was fined $37,000 and suspended for two years), and (c) ***falsified*** firm records by backdating supervisory documents and then submitting some of them to FINRA (for which he was suspended for 18 months). The *Larson* panel pointedly noted that it "took into account that the Guidelines recommend that suspensions not exceed two years" and that the "totality of Larson's misconduct [did not] warrant[] a bar." *Id.* Petitioners did not submit falsified and/or backdated records here. Nor did they submit materially misleading

records to FINRA. There are no extraordinary circumstances here that warranted a lifetime bar or expulsion.

The Commission's decision attempts to distinguish such cases, including *Jarkus* and *Novack*, by contending that in those cases the respondents did not know FOCUS reports were erroneous. APP-645. But neither did Ms. Jones know the FOCUS report she filed were erroneous as well. Similarly, where the Commission attempted to distinguish *Hartman* and *Larson* on the condition that those individuals "eventually fully and truthfully responded to Rule 8210 requests," APP-648, the Commission ignores that Ms. Jones fully responded to the Rule 8210 requests through her written statement and August phone call correcting the record with respect to her mother. At most, this is a case of a *late* response (but even then due to personal issues, including her health), not a case of an incomplete or falsified response.

Other cases drive home the point. The Commission cites *Trevor Michael Saliba*, Exchange Act Release No. 91527, 2021 WL 1336324 (Apr. 9, 2021), as an example of a case in which an individual "fail[ed] to provide information or testimony or to permit an inspection and copying of books, records, or accounts." APP-639 n.30. That more innocuous

description is not at all what happened in that case, in which a bar was rightfully imposed (but even then, the Commission reversed and permitted Saliba to reapply after two years). There, Saliba ***falsified*** engagement agreements and compliance records to FINRA, including by ***forging*** signatures, and still further gave false testimony and failed to respond completely to FINRA's information requests.

In the case of *Merrimac Corporate Securities*, also cited by the Commission, *see* APP-639 n.31, there were similarly violations relating to falsified records, including forged signatures, and a $225,000 fine, yet only a 30-day suspension of the firm and a one-year suspension of its principal. Exchange Act Release No. 86404, 2019 WL 3216542 (July 17, 2019).

And while the Commission further cites *David Adam Elgart*, APP-639 n.32, that too undermines FINRA and the Commission's lifetime bar here. There, Elgart "willfully failed to update his Form U4 in a timely manner to reflect five unpaid tax liens" and "provided a false statement in bad faith to FINRA in responding to a questionnaire regarding the liens," but was only suspended a total of seven months and fined $20,000.

Exchange Act Release No. 81779, 2017 WL 4335050 (Sept. 29, 2017). That is a far cry from the outlier punishment imposed here.

Whereas the Commission skips past that Ms. Jones' refusal to answer a personal question about her mother (when told by FINRA that no such questions would be asked)[3] did not impede the investigation and cites *Keilen Dimone Wiley* to suggest that Ms. Jones "prolonged and distracted FINRA's examination" "regardless of whether the refusal ultimately impeded the results of that examination," APP-640 n.38, the Sanction Guidelines specifically direct FINRA to consider the "[i]mportance of the information" to FINRA's investigation, *see North Woodward Fin. Corp.*, Exchange Act Release No. 74913, 2015 WL 2151765, at *11 (May 8, 2015)[4] (quoting Sanction Guidelines at 33). FINRA and the SEC should be determined to have already conceded that the information did ***not*** impede FINRA's investigation. *E.g.* APP-455 ("Enforcement has not, however, established that Jones's refusal to

[3] FINRA Enforcement is a prosecutor of the broker-dealer industry. That being the case, "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

[4] A lifetime bar was imposed in that case, but only because respondents had prior disciplinary histories and withheld information regarding their alleged conversion of elderly clients' funds.

testify that her mother was still alive impeded the staff's investigation."). And while FINRA argued to the Extended Hearing Panel that FINRA needed to know whether Ms. Jones' mother was alive to ask Ms. Jones to ask her mother to obtain credit card records, FINRA disingenuously ignores that Ms. Jones expressly testified at her OTR that her mother had already tried to obtain the credit card records. APP-361–364.

Comparison to these other cases is not meant to negate the violations in this case, but simply to note the disproportionate and excessive punishment imposed against Petitioners. And the Court should find error in this regard and reverse the lifetime bar even if it determines that FINRA is not a state actor.

***Second***, the NAC Panel included a competitor. Trial before an impartial adjudicator is a basic requirement of due process. The NAC however, was not fair and impartial because one of its members – Duncan Williams – was an owner and associated person of a competitor broker-dealer but failed to recuse himself in violation of FINRA Rule 9332. *See* FINRA Rule 9332 (providing that "[i]f at any time a member of the National Adjudicatory Council . . . determines that the member [or] Panelist . . . has a conflict of interest or bias or circumstances otherwise

exist where the fairness of the member [or] Panelist . . . might reasonably be questioned, the member [or] Panelist . . . shall notify the Chair . . . [who] shall issue and serve on the Parties a notice stating that the member [or] Panelist . . . has withdrawn from the matter.").

That requirement to recuse is an affirmative duty. The inclusion of a biased panelist (or even one that may appear to be biased) presents a fault of a structural nature, affecting the entire framework within which the NAC decision was rendered. *See Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). "[T]rial before a biased judge is an archetypal example of a constitutional error that necessarily renders a trial fundamentally unfair." *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999)). Accordingly, in such cases, prejudice is presumed. Indeed, because the very structure of FINRA hearings allows industry participants to appear as panelists and thus invites the potential that a competitor will serve as an adjudicator over another, the requirement for recusal is a necessary safeguard against such constitutional infirmity. That error takes on additional import here where the NAC *increased* the consecutive two-

year suspensions to a lifetime bar and ordered sanctions totaling $38,000 (in violation of the right to jury trial, as described below).

In its decision below, the Commission states that Petitioners failed to move to recuse Mr. Williams and state that even if it were raised earlier, the SEC has consistently rejected arguments regarding the fact a panel member is employed by a potential competitor is disqualifying. APP-654. The Commission's decision is impossible to square with Rule 9332, which does not require a motion but does require recusal in any case in which the fairness of a member "might reasonably be questioned." Mandatory recusal where the adjudicator stands to profit from ruling one way or the other is a standard feature, borrowed from judicial recusal rules that protect due process. *See Liteky v. United States*, 510 U.S. 540, 548 (1994) ("[W]hat matters is not the reality of bias or prejudice but its appearance."); *see also United States v. Microsoft*, 253 F.3d 34, 115 (D.C. Cir. 2001) ("Appearance may be all there is, but that is enough.").

Ultimately, the Commission is either arbitrarily misconstruing Rule 9332, or the rule itself does not meet the standard for due process. Either way, the inclusion of an adjudicator who profits from sidelining Petitioners is impermissible.

***Third***, FINRA applied duplicative claims and facts to find both the crime and aggravation for sanctions, while ignoring mitigation in Petitioners' favor.

FINRA justified its lifetime bar by contending that there were "significant" aggravating circumstances. But the "aggravators" were one-and-the-same with the violations themselves. FINRA contended (and the Commission agreed) that aggravation existed because "[f]or more than a year and a half, Jones intentionally reported a non-allowable asset (CD No. 0331) as an allowable asset and thereby inflated KJC's net capital." APP-642. But that was the violation itself—maintaining incorrect books and records and filing incorrect FOCUS reports as a result. That is, FINRA alleged that Petitioners filed false FOCUS reports based on Petitioners' use of CD No. 0331 when it was a non-allowable asset, and then used that same conduct as an aggravating circumstance. Fundamental fairness and the Double Jeopardy Clause require that an aggravator be something ***separate from the violation itself***, such as a ***prior*** FINRA violation, so as to not inflict multiple punishments for the same offense. *Cf. Witte v. United States*, 515 U.S. 389, 399 (1995) (holding that use of evidence of related criminal conduct to enhance a

defendant's sentence for a separate crime does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause."); *id.* at 410 (Stevens, J., concurring in part and dissenting in part) ("However, insofar as the sentencer relies on the offense as aggravation of the underlying offense, the Double Jeopardy Clause is necessarily implicated. At that point, the defendant is being punished for having committed the offense at issue . . . .").

The Commission's finding that the information was "important and material" as an aggravating circumstance and reference to net capital, APP-642, is similarly erroneous as ***there was no finding of a violation premised on net capital deficiency***. Stated simply, FINRA's Complaint does not include any cause of action for a net capital deficiency. But even if it had, there was still no knowing and willful violation, as Ms. Jones did not know she was reporting a non-allowable asset. Moreover, and to the extent FINRA argues it operates within a set framework when determining aggravating circumstances, the only explanation for use of such things as whether the information was "important and material" is that the FINRA sanction guidelines are so

vague as to contain no restriction on FINRA's ability to impose aggravation and thus a lifetime bar in any case.

With respect to the lack of customer harm, the Commission's decision further committed the violation-and-aggravation error by contending that "Jones's repeated and knowing misconduct both demonstrates a pattern of disregard for her reporting and recordingkeeping obligations and confirms the risk that she poses to customers and other market participants if she were not barred." APP-644. But again, that is the equivalent of saying that her knowing and willful misconduct is both the violation itself and the aggravating circumstance that needs a lifetime bar to avoid the risk she poses.

Stated simply, FINRA should have charged only two claims: filing incorrect FOCUS reports (Exchange Act Rule 17a-5(a)(2) and FINRA Rule 4511) and an untimely response to FINRA's requests (Rule 8210).[5] And FINRA should have found no aggravating circumstances, or at the very least that any potential aggravation did not predominate over

[5] As stated in the briefing below, FINRA's duplication of charges (every Rule 4511 violation and Rule 8210 violation triggers a Rule 2010 violation) further inflates the charges a FINRA member faces from the same conduct. *See, e.g.*, *Barnes v. Veath*, No. 14-cv-01277-NJR, 2014 WL 7005190, at *2 (S.D. Ill. Dec. 11, 2014) ("Nevertheless, knowingly filing duplicative charges and imposing a duplicative punishment falls within the realm of the Due Process Clause.").

mitigating circumstances—including the fact that the purportedly withheld information was ultimately provided and even FINRA conceded earlier in these proceedings that it did not impede its investigation. FINRA has taken a molehill and made a mountain out of it to impose a lifetime bar of a previously exemplary 20-plus year FINRA member.

And it did it all while FINRA Enforcement did not appeal the initial sanction but punished Petitioners with a lifetime bar when they dared to exercise their right to appeal, with a NAC Panel that included a competitor. The tangle of APA and due process violations in this case is precisely what happens when private regulators wield state power without the check of the Due Process Clause.

## II. FINRA's Structure Violates the Appointments and Removal Clauses

The Appointments Clause "preserves . . . the Constitution's structural integrity" by ensuring that officials remain "accountable to political force and the will of the people." *Freytag v. C.I.R.*, 501 U.S. 868, 878, 884 (1991). The due process violations above are compounded by the fact FINRA's governing members and NAC adjudicators are not appointed in a manner consistent with the separation of powers and the Appointments Clause.

The Appointments Clause provides that the President shall name "officers of the United States" while permitting that "Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." U.S. Const. art. II, § 2, cl. 2. The clause protects the President's prerogative to helm the executive branch and also serves the separation of powers by preventing "Congress from dispensing power too freely." *Freytag*, 501 U.S. at 880. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Id.*

The appointment power takes on added dimension where Congress has created an independent agency, allowing removal of its principal officers only for cause. *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935). For those agencies, which include the SEC, good-cause removal is a permissible limitation on the President's executive authority under Article II. *Id.* at 629. But when an independent agency in turn makes appointments that provide only for-cause removal, the "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund v. Pub. Co.*

*Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010). At issue in *Free Enterprise Fund* was FINRA's governmental twin: the Public Company Accounting Oversight Board ("PCAOB"). Like FINRA, the PCAOB enforces federal laws along with its own rules and has the ability to impose stiff penalties, including a lifetime ban from the public accounting industry. *Id.* at 485. Also "like the officers and directors of the self-regulatory organizations," PCAOB members were insulated from SEC control. *Id.* at 486-87. In fact, the PCAOB was "modeled on" SROs. *Id.* at 484.

What is constitutionally deficient in the PCAOB is equally deficient in FINRA—provided FINRA is a state actor. If it is, then FINRA's board is unconstitutionally comprised. Its board would need to be appointed either by the President as officers of the United States or by the SEC as inferior officers. U.S. Const. art. II, § 2, cl. 2; *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018). Moreover, the additional layer of good-cause protection for the hearing officers and NAC members who adjudicated Petitioners' case fulfill the Supreme Court's nightmare of "a Matryoshka doll" of removal protections that preclude presidential oversight "even as they exercise[ ] power in the people's name." *Free Enter. Fund*, 561 U.S. at 497.

Lest there be any question, FINRA hearing panel members and NAC panel members are officers (even if inferior) of the United States. According to the Supreme Court, an officer is generally "any appointee exercising significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), or, more specifically:

> (1) those charged with "the administration and enforcement of the public law"; (2) those granted "significant authority"; (3) those with "responsibility for conducting civil litigation in the courts of the United States"; and (4) those "who can be said to hold an office . . . that has been created either by 'regulations' or by 'statute.'"

*Free Enter. Fund*, 561 U.S. at 539 (Breyer, J., dissenting) (internal quotations omitted). Using those guides, the following "inferior officers" have been discovered: "thousands of clerks in the Departments of the Treasury, Interior, and the othe[r]" departments, *United States v. Germaine*, 99 U.S. 508, 511 (1878); Tax Court special trial judges, *Freytag*, 501 U.S. at 881-82; and, analogously, SEC administrative law judges, *see Bandimere v. S.E.C.*, 844 F.3d 1168, 1179-82 (10th Cir. 2016). So too here must FINRA's Hearing Panel Adjudicators and NAC panel members be considered "inferior officers."

First, FINRA is the only SRO and, in essence, FINRA hearing panel and NAC members serve as the sole SRO adjudicators for all non-

exchange members. *See Seattle Master Builders Ass'n v. Pac. N.w. Elec. Power & Conservation Planning Council*, 786 F.2d 1359 (9th Cir. 1986). Second, there is no SEC role in appointing FINRA's leadership, while FINRA hearing panel and NAC members are protected from removal. Indeed, hearing officers "may not be terminated except by the FINRA Chief Executive Officer." FINRA Office of Hearing Officers' Decisions and Orders, *available at* https://www.finra.org/rules-guidance/adjudication-decisions/office-hearing-officrs-oho. NAC panel members are appointed by the FINRA board, FINRA by-law Art. V, § 5.3, and are appointed for four-year terms and essentially may be removed only for cause, *id.* § 5.8 (for "refusal, failure, neglect, or inability to discharge the duties of such office by majority vote of the FINRA Board"). Third, both FINRA and the NAC's panel members exercise significant discretion in performing "important functions" commensurate with the SEC ALJ's functions in *Bandimere* and STJ's functions in *Freytag*. For example, they develop the administrative record, take evidence, and make credibility findings to which the SEC afford considerable weight. *See John Edward Mullins*, Exchange Act Release No. 66373, 2012 WL 423413, at *13 (Feb. 10, 2012). And, following the conclusion of a trial-

like hearing, FINRA and the NAC "have authority to issue initial decisions that declare respondents liable and impose sanctions." *Bandimere*, 844 F.3d at 1180. To the extent an appeal is not timely filed, FINRA's decision becomes final.

The SEC's decision only further underscores the state action and delegation issues noted above in an attempt to avoid the appointments issue. The Commission concludes that the appointment and removal requirements apply only if FINRA's personnel are "officers of the United States," but contends they are not because "FINRA is not 'part of the government'," "was not created by the government[,] and its leaders are not chosen by the government." APP-651 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995)). To the extent the Commission retreats to a ***lack*** of governmental oversight over FINRA, that only underscores the delegation problem noted above.

The SEC next states that a party can be private for purposes of the state actor analysis separate from what makes a person an officer of the United States for purpose of *Lebron*'s analysis. *Id.* That is true in part, but not with respect to FINRA here. That is because the difference in analysis generally exists because some private parties can perform

*specific tasks* that can be deemed governmental, even while the party does not constitute part of the government itself for all purposes. Moreover, the *Lebron* test, at least as applied in that case, looked to whether Amtrak was created by the government. 513 U.S. at 383. FINRA arguably sits in the intersection of entities that were not initially created by the government but whose actions entirely can be said to now be those ***of the government***. *See, e.g.*, *Sprauve v. West Indian Co. Ltd.*, 799 F.3d 226, 232 n.5 (3d Cir. 2015) (stating private origins to not immunize an entity from government actor status). Thus, while the *Lebron* test might not be met if a rigid "created by the government" requirement were imposed (and ignoring that the government created the SRO role, within which FINRA fits), FINRA's state action is not just state action in some respects but so wholly that it should nevertheless be deemed equally *part of the government itself* such that appointment of its officers (like those belonging to the SEC and PCAOB) needs to satisfy the Appointments Clause.

## III. The Sanctions Imposed Against Petitioners Violate the Right to Trial by Jury

The Seventh Amendment commands that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII.

In *S.E.C. v. Jarkesy*, the Court expressly held that enforcement cases threatening monetary penalties based on allegations of securities fraud must be prosecuted in an Article III court with a jury trial. 603 U.S. 109 (2024). All that remains is to apply the same holding to FINRA fines affirmed by the SEC on review. Fortunately, the Court in *Jarkesy* already accomplished the heavy lift of determining that charges relating to the securities industry for fraud are "legal in nature," especially when the charging agency seeks civil penalties or similar monetary sanctions. *Id.* at 123-124 (stating that fines are "legal rather than equitable" when they are tied "to the perceived need to punish the defendant rather than to restore the victim"). "In sum," the Court stated, "the civil penalties in this case [by the SEC] are designed to punish and deter, not to compensate. They are therefore a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125 (cleaned up).

FINRA's fines (just like SEC civil penalties) against Petitioners are exactly that. The lifetime bar against Petitioners addresses a public harm that can be justified only by general deterrence, and neither FINRA nor the Commission identified any customers or persons that were purportedly harmed by Petitioners—there are none. And the Commission decision is bereft of any "detailed explanation" why Petitioners purportedly pose a threat to anyone. *PAZ Securities, Inc. v. S.E.C.*, 494 F.3d 1059, 1065 (D.C. Cir. 2007). Further, lifetime bars, like any suspension, are inherently punitive because they deliver nothing to victims and depart from the status quo. *Saad v. S.E.C*, 873 F.3d 297, 305 (D.C. Cir. 2017) (Kavanaugh, J., concurring). Unlike disgorgement that returns victims a sum approximating what they lost, a lifetime bar imposes a cost on the rule-breaker without conferring a benefit on victims. And unlike prospective relief, a lifetime bar goes beyond requiring a broker-dealer to comply with securities laws, which would represent a status quo, albeit with heightened consequences for non-compliance.

Here, FINRA and the SEC imposed a lifetime bar to serve only the goals of punishment and retribution. And any claim that specific

deterrence justifies the lifetime bar is without support in the record. Petitioners had not violated a single rule in their more than 20-year history. They participated in FINRA's investigation, and provided responsive records and information, albeit delayed for the reasons described above. These facts do not justify a prophylactic bar specific to Petitioners.

As for the monetary sanctions, FINRA fined KJC $38,000, *which the SEC affirmed*. APP-629, APP-641, APP-655. But, again, there are no victims or even an attempt by the SEC to identify an "equitable" purpose for its fines. Indeed, FINRA fines are paid directly to FINRA—not to any potential victim. *See* FINRA Rule 8320(a) ("All fines and other monetary sanctions shall be paid to the Treasurer of FINRA and shall be used for the general corporate purposes."). This aligns with *Jarkesy*'s observation that "[t]he final proof that this remedy is punitive is that the SEC is not obligated to return any money to victims." 603 U.S. at 124. Further still, FINRA rules even direct that a *purpose* behind sanctions is deterrence: "Adjudicators should design sanctions that are meaningful and significant enough to prevent and discourage future misconduct by a

respondent and deter others from engaging in similar misconduct." FINRA, *Sanction Guidelines* (2015) at 2.

Stated simply, FINRA imposed punitive measures against Petitioners (sanctioning them with a monetary fine and effectively taking their livelihoods) without giving them the right to a trial by jury.

To prebut the anticipated SEC response of waiver, there can be no waiver of a constitutional right before an agency, much less a private entity if that is what FINRA claims to be. Indeed, the Court has already held that a party can first raise a constitutional claim in federal court ***without*** raising it before the agency. *See, e.g.*, *Axon Enterp., Inc. v. F.T.C.*, 598 U.S. 175, 188-189, 194 (2023) (holding constitutional claims outside the statutory review scheme for the agency, because they raise "standard" issues of "administrative and constitutional law, relating not at all to 'considerations of agency policy'" (internal citation omitted)); *see also Carr v. Saul*, 593 U.S. 83, 92 (2021) ("agency adjudications are generally ill suited to address structural constitutional challenges").

Moreover, and even if the SEC (or FINRA, which argues it is not even a state actor) could rule on a constitutional claim, raising the claim before the SEC would have been futile where it goes to the structure of

the agency and where the agency has repeatedly rejected such constitutional challenges at every turn. *See, e.g.*, *Alliance for Hippocratic Medicine v. F.D.A.*, No. 23-10362, 2023 WL 2913725, at *16 (5th Cir. Apr. 12, 2023) ("Plaintiffs need not exhaust claims where they can demonstrate 'the futility or inadequacy of administrative review.' The futility exception applies when exhaustion would be 'clearly useless' and 'it is certain [a] claim will be denied.'" (citations omitted)).

Indeed, the SEC's decision in this case—despite taking more than four years to issue—largely repeats its own prior decisions and arguments submitted in various briefs across the country rejecting such constitutional challenges at every turn. *See, e.g.*, APP-649–650 (listing its briefs in other proceedings and parroting that "[w]e agree with that analysis and therefor explain only briefly why we conclude that Applicants' claims lack merit"). Unless the SEC in its response is now willing to *concede* any of the constitutional claims, it must necessarily agree that it would have denied said claims if presented before.

## **CONCLUSION**

This Court should vacate the SEC's order. The process leading to that order and each of the sanctions imposed were improper under both

the Constitution and the APA. As a state actor, FINRA was obliged to provide due process, which it did not come close to doing. In terms of the sanctions imposed, the Commission's decision to impose a lifetime bar is inconsistent with precedent and relies on double-counting offenses and aggravating factors. To the extent a remand is necessary, the Court should remand for proceedings before a constitutionally-compliant agency, or, should FINRA seek to reimpose a monetary sanction, a trial by jury. But the Commission's order and the sanctions imposed cannot stand.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Matthew P. Hoxsie*

Dominic E. Draye
Matthew P. Hoxsie
GREENBERG TRAURIG, LLP
2375 East Camelback Rd., Ste. 800
Phoenix, AZ 85016
drayed@gtlaw.com
hoxsiem@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on August 7, 2026. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Matthew P. Hoxsie*
Matthew P. Hoxsie

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7) because this brief contains 12,930 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook type.

/s/ *Matthew P. Hoxsie*
Matthew P. Hoxsie